**THIRD DIVISION**
**ELLINGTON, P. J.,**
**BETHEL, J., and SENIOR APPELLATE JUDGE PHIPPS**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**June 1, 2018**

# In the Court of Appeals of Georgia

A18A0211. KENNESTONE HOSPITAL, INC. d/b/a WELLSTAR
     KENNESTONE HOSPITAL et al. v. GEORGIA
     DEPARTMENT OF COMMUNITY HEALTH et al.

ELLINGTON, Presiding Judge.

Kennestone Hospital, Inc. ("Wellstar Kennestone") and Wellstar Cobb Hospital Cancer Center, LLC ("Wellstar Cobb") (collectively, "Wellstar") appeal from the order of the Superior Court of Cobb County affirming the Georgia Department of Community Health's ("DCH") grant of a certificate of need ("CON") to Piedmont Hospital, Inc. d/b/a Piedmont Atlanta Hospital ("Piedmont") for establishment of a radiation therapy service in Cobb County. We affirm for the reasons set forth below.

The CON program, which is administered by DCH, "establishes a system of mandatory review requiring that, before new institutional health services and facilities can be developed, the developer must apply for and receive a CON from DCH.

OCGA §§ 31-6-1; 31-6-40 (a), (b)." *ASMC, LLC v. Northside Hosp., Inc.*, 344 Ga. App. 576, 577 (810 SE2d 663) (2018). DCH reviews and either grants or denies a CON application "under general and specific review considerations in rules and regulations promulgated by the DCH as set forth in Ga. Comp. R. & Regs. (rule or rules) 111-2-1-.09 and 111-2-2-.01 through 111-2-2-.43." Id.

The record shows that Piedmont, a general acute care hospital located in Fulton County, offers radiation therapy services at two of its Atlanta campuses. Piedmont operates one non-special purpose megavoltage radiation therapy ("non-special MRT") linear accelerator unit at its main campus on Peachtree Road ("Piedmont Main") and two such units at its "Piedmont West" campus on Howell Mill Road. In 2015, DCH published notice that there was not sufficient need for non-special MRT services to warrant its acceptance of new applications for such services pursuant to the need methodology set forth in its regulations.[1] The notification provided that DCH would nevertheless accept and review applications for new or expanded non-special MRT services under the regulatory exceptions to the need methodology.[2] One such exception is the "atypical barrier" to care exception, which authorizes CONs "[t]o

---

[1] See Ga. Comp. R. & Regs. r. 111-2-2-.42 (3) (a).

[2] See Ga. Comp. R. & Regs. r. 111-2-2-42 (3) (b).

remedy an atypical barrier to non-special MRT services based on cost, quality, financial access and geographic accessibility."[3]

In response to the review notification, Piedmont filed an application with DCH seeking a CON for a project that included decommissioning one of its linear accelerators at Piedmont West and installing a new linear accelerator at its Kennesaw, Cobb County, facility. Piedmont sought the CON on the ground that its project sought to remedy an atypical barrier to care.

Wellstar, through a statement and a presentation to DCH, opposed Piedmont's CON application. Wellstar Kennestone offers radiation therapy services and operates three non-special MRT units at its main campus in Marietta, Cobb County. Wellstar Cobb provides radiation therapy services, including two linear accelerators, at its campus in Austell, Cobb County.

Following its initial review,[4] DCH denied Piedmont's request for a CON to establish non-special MRT service at the Kennesaw, Cobb County location. DCH found, among other things, that Piedmont "failed to demonstrate that non-special

---

[3] See Ga. Comp. R. & Regs. r. 111-2-2-42 (3) (b) 4.

[4] See OCGA § 31-6-43 (governing acceptance or rejection of CON applications).

3

radiation therapy services are not available to the proposed service population despite the existence of a service in such close proximity[.]" Piedmont appealed DCH's initial decision to the Certificate of Need Appeal Panel for an administrative appeal hearing,[5] and Wellstar intervened in the hearing in support of DCH's initial decision.[6] Following an evidentiary hearing, the hearing officer reversed DCH's initial decision and ordered that DCH issue a CON to Piedmont.

In summary, the hearing officer's findings show the following. Piedmont's proposed project in Kennesaw would primarily serve Cobb and Fulton County, with a secondary service area in Cherokee and Pickens County. Radiation therapy services are concentrated in the core of Atlanta notwithstanding growing populations in the counties north of the city, resulting in a maldistribution of services. The roadways

---

[5] The Certificate of Need Appeal Panel, which consists of a panel of independent hearing officers, is an agency separate from the DCH and serves to review DCH's initial decision to grant or deny a CON application. OCGA § 31-6-44 (a). The appointed hearing officer conducts a full evidentiary hearing, OCGA § 31-6-44 (e), and "[t]he appeal hearing conducted by the appeal panel hearing officer shall be a de novo review of the decision of the department." OCGA § 31-6-44 (f).

[6] See OCGA § 31-6-44 (d) ("Any applicant for a project [or] any competing health care facility that has notified the department prior to its decision that such facility is opposed to the application before the department . . . shall have the right to an initial administrative appeal hearing before an appeal panel hearing officer or to intervene in such hearing.").

4

needed to access Piedmont West and Piedmont Main are some of the most congested in Atlanta. Other than Wellstar Kennestone, existing service providers are located 16 or more driving miles from the proposed project site and access to those providers requires travel on roadways that are some of the most crowded in the State.

Many radiation courses require treatment on a daily basis, from Monday through Friday, for a five to eight week period. Cancer patients often suffer from conditions that impair their ability to drive or to travel, and the hearing officer noted the "vast amount of physician testimony" addressing the debilitating effects of cancer, its treatment, and the burden faced by cancer patients who must travel for radiation therapy. Patients traveling from the project's service area, the hearing officer concluded, "face immense travel burdens that affect them physically, emotionally, financially, and mentally, impacting their care and recovery."

Cancer treatment also involves highly integrated care, and planning for cancer services is different from other types of medical services because of the high number of visits, the continued care, and the degree of coordination among multiple specialists that is often required. Expert testimony supported a finding that it is in the best interest of patients to receive radiation therapy care within an integrated health care system as close to home as possible. Medical specialists who administer cancer

5

treatments closely coordinate patient treatment, often through interdisciplinary meetings, but physicians outside the Piedmont system do not participate in those meetings. When Piedmont cancer patients need radiation therapy and must obtain that care outside the Piedmont system[7] due to access concerns, their continuity of care is broken, which negatively impacts those patients.[8]

The hearing officer found that many Piedmont patients face barriers to radiation therapy services in the form of lack of continuity of care with their treatment team, access to electronic medical records, and burdensome travel times. The hearing officer also concluded that the proposed project to install a linear accelerator in Kennesaw would allow certain patients to minimize their travel burdens and maintain continuity of care. Although only five miles away from the site of the proposed project, Wellstar Kennestone's radiation therapy service was not, the hearing officer found, a viable existing alternative to the project due to its high utilization[9] and the

---

[7] Physician testimony showed that Wellstar has a closed medical staff model that precludes non-Wellstar physicians from treating patients at Wellstar's radiation therapy units.

[8] For example, as one physician expressed at the hearing, "continuity of care is extremely important because mistakes are made less often."

[9] Testimony at the hearing showed that utilization percentage has a particular meaning in the context of radiation therapy services and is calculated by DCH using

6

lack of continuity of care for Piedmont patients. Based on these findings, the hearing officer found that the CON requested by Piedmont was warranted under the atypical barrier exception.

Wellstar appealed the hearing officer's decision to the Commissioner of DCH.[10] In a final order, the Commissioner's designee adopted the hearing officer's findings of fact and conclusions of law, affirmed the decision of the hearing officer, and ordered DCH to award the requested CON to Piedmont. Wellstar sought judicial review of DCH's final order,[11] which the superior court affirmed.[12] Following this Court's grant of its application for discretionary appeal, Wellstar appeals from the order of the superior court.

In reviewing DCH's final order, the superior court was authorized to

> reverse or modify the final decision only if substantial rights of the appellant have been prejudiced because the procedures followed by the department, the hearing officer, or the commissioner or the

---

a mechanism that weighs different visits based on category.

[10] See OCGA § 31-6-44 (i).

[11] For purposes of judicial review, DCH's final order constituted the final department decision. See OCGA § 31-6-44 (m)

[12] See OCGA § 31-6-44.1 (providing for judicial review of DCH's final decision).

administrative findings, inferences, and conclusions contained in the final decision are: (1) In violation of constitutional or statutory provisions; (2) In excess of the statutory authority of the department;(3) Made upon unlawful procedures; (4) Affected by other error of law; (5) Not supported by substantial evidence, which shall mean that the record does not contain such relevant evidence as a reasonable mind might accept as adequate to support such findings, inferences, conclusions, or decisions, which such evidentiary standard shall be in excess of the "any evidence" standard contained in other statutory provisions; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

OCGA § 31-6-44.1 (a). Wellstar did not contest DCH's findings of fact or contend that its decision was not supported by substantial evidence. Thus, on judicial review the superior court determined whether, as a matter of law, "the conclusions of law drawn by the DCH from those findings of fact supported by substantial evidence are sound." (Citation and punctuation omitted.) *ASMC, LLC v. Northside Hosp., Inc.*, 344 Ga. App. at 581. On appeal, this Court applies the same standard of review. Id. "[O]ur duty is not to review whether the record supports the superior court's decision but whether the record supports the final decision of the administrative agency." (Citation and punctuation omitted.) *Ga. Dept. Of Community Health v. Satilla Health Svcs., Inc.*, 266 Ga. App. 880, 883 (598 SE2d 514) (2004).

8

1. At issue is whether DCH properly applied its "atypical barrier" exception in awarding the CON. The atypical barrier exception contemplates that DCH may grant a CON to an applicant so as "[t]o remedy an atypical barrier to non-special MRT services based on cost, quality, financial access and geographic accessibility." Ga. Comp. R. & Regs. r. 111-2-2-.42 (3) (b) 4. In construing a similar rule in *Surgery Center, LLC v. Hughston Surgical Institute, LLC*, 293 Ga. App. 879, 881-882 (668 SE2d 326) (2008) (physical precedent only), this Court concluded that a CON applicant, in order to establish an atypical barrier to service, must show that "service of a sufficiently high quality was not available in the area, that a particular group of patients needed such care, and that the proposed project would reach this population."[13] The hearing officer, in reliance on *Hughston Surgical*, found that in order to qualify for the atypical barrier to care exception Piedmont was required to show: "(1) that radiation therapy services are not sufficiently available in the project area, (2) that there is an identified population of patients in need of radiation therapy services who are not able to access those services, and (3) that Piedmont's proposed project will remedy the atypical barrier."

---

[13] The parties agree that the *Hughston Surgical* criteria should apply in assessing whether an applicant has shown an atypical barrier to non-special MRT services.

Wellstar argues that DCH's final order was arbitrary, capricious, and an abuse of discretion in that it ruled that the atypical barrier exception may be granted to improve access to particular provider of radiation therapy services– in this case to remedy barriers faced by *Piedmont* patients in accessing *Piedmont's* radiation therapy services. See OCGA § 31-6-44.1 (a) (6). Rather, Wellstar maintains, Ga. Comp. R. & Regs. r. 111-2-2-.42 (3) (b) 4 refers to barriers to "non-special MRT *services*" (emphasis supplied), and not to barriers in accessing a particular provider. DCH's final order, Wellstar maintains, is therefore (i) inconsistent with the plain language of DCH regulations, OCGA § 31-6-40 et seq. (the "CON Act"), and this Court's decision in *Hughston Surgical*, and (ii) ignores DCH's own interpretation of the atypical barrier exception.

(a) DCH's final order does not expressly rule that the atypical barrier exception may be applied to improve access to a particular provider of radiation therapy services. Rather, Wellstar points to the findings made by the hearing officer and argues that, given these findings, which were incorporated in DCH's final order, DCH awarded the CON based on difficulties faced by Piedmont patients in accessing radiation therapy at Piedmont's two existing locations rather than a barrier in accessing radiation therapy services generally. The hearing officer's decision does

10

identify, among other things, the difficulty Piedmont patients face in accessing Piedmont's existing radiation therapy services, and its findings often refer to barriers faced by Piedmont patients in particular, not only in traveling from the project area but in maintaining continuity of care. Wellstar acknowledges, however, that DCH administrative precedent shows that a CON applicant may rely on its own patients as the type of patient facing an atypical barrier to care.[14] In addition to Piedmont's radiation therapy services, the hearing officer considered Wellstar Kennestone and "all other providers" within at least 16 miles of the project in assessing whether there was a barrier to care. The hearing officer also expressly applied the *Hughston Surgical* criteria and acknowledged that at issue was whether radiation therapy services were not sufficiently available in the project area. Additionally, the hearing

---

[14] For example, the record shows that, based on the atypical barrier exception, the DCH granted Northeast Georgia Medical Center a CON to acquire and operate a linear accelerator to provide radiation therapy services at the applicant's existing campus in Hall County. The project proposed to remedy a barrier to quality of care for a subset of patients in the vicinity of that campus. In its decision, the hearing officer considered evidence of the applicant's patients who faced difficulties accessing treatment as "representative of the type of patients experiencing a barrier to care," and found that DCH "reasonably concluded that, for a subset of patients in [the area of the proposed project], the requirement to travel to the [applicant's main campus] for treatment" caused hardships such as aggravation of side effects and missing or altering treatment.

11

officer's findings show the *integrated* nature of cancer care, often involving numerous specialists, and the importance of maintaining continuity of care in receiving radiation therapy–which is far different from, as the hearing officer noted, "choosing a physical therapist after an orthopedic referral." The hearing officer's factual findings and conclusions of law are consistent with an application of the atypical barrier exception to remedy a barrier to services faced by an identified group of patients, and not to award a CON simply for the purpose of making it more convenient for Piedmont patients to drive to a Piedmont facility. Wellstar does not show that DCH in its final order violated Ga. Comp. R. & Regs. r. 111-2-2-.42 (3) (b) 4, the CON Act, or the *Hughston Surgical* criteria.

(b) Wellstar also contends that DCH failed to follow its own administrative precedent and did not explain its departure from that precedent. See *Charter Medical-Fayette County v. Health Planning Agency*, 181 Ga. App. 184, 184 (2) (351 SE2d 547) (1986) (reviewing claim of error that, in denying a certificate of need, the health planning agency departed from administrative precedent without explanation).[15] The record shows that, in a previous decision, DCH denied a CON

_____

[15] See generally *Atchison, Topeka & Santa Fe R. Co. v. Wichita Board of Trade*, 412 U.S. 800, 808 (II) (37 LE2d 350, 93 SCt 2367) (1973) (an agency's departure from prior norms "must be clearly set forth so that the reviewing court may

12

application by Emory Johns Creek Hospital (the "*Emory Johns Creek*" decision) to establish non-special MRT Services so as to remedy atypical barriers to such services based on geographical accessability and quality.[16] Wellstar argues that, in light of *Emory Johns Creek*, DCH administrative precedent establishes that access to a particular provider is not a valid basis for granting an atypical barrier exception, and that DCH departed from that precedent without explanation. Although grant of the CON would have the effect of making it easier for Piedmont patients to access Piedmont's radiation therapy services, evidence showed that the barriers faced by Piedmont patients had an adverse effect on the quality of patient care. In *Emory Johns*

---

understand the basis of the agency's action").

[16] In *Emory Johns Creek*, the proposed project "was expected to yield greater conveniences specifically in accessing MRT Services associated with Emory Healthcare." The project was also "expected to increase patient access to the most advanced cancer services within the defined service area, through innovative treatment options, clinical trials and research." In determining that there was no geographical access barrier, the DCH found "that in-house access to MRT services, as a non-emergent service, is not required for the service to be reasonably accessible to the region or to any defined service area." The DCH also noted that "access to a particular provider, as the basis for granting an exception, would undermine the Department's health planning effort to maintain accessible *services* regionally[.]" (Emphasis in original). In finding that there was no barrier to services based on quality, the DCH found that "service area patients have reasonable access to quality radiation therapy services . . . despite the service not being provided" at the proposed location.

13

*Creek*, on the other hand, patients in the service area already had access to quality radiation therapy services notwithstanding that the area may have lacked the "unique" and "cutting edge" services that the applicant's project sought to provide. Other material differences in this case from *Emory Johns Creek* include the finding of a maldistribution of services in Cobb County, where the proposed project is to be located, and the barriers to continuity of care faced by patients in the proposed service area. And, as the superior court noted, the *Emory Johns Creek* decision did not involve existing area providers having limited or no capacity to provide radiation therapy because they were full,[17] near full, or largely inaccessible. Because of these material differences, Wellstar does not show that DCH departed from established administrative precedent, or that its final order should be deemed arbitrary and capricious because it departed from such precedent without explanation.

2. Wellstar contends that DCH's final order erroneously fails to consider the ability of existing radiation therapy providers to serve the same pool of patients that Piedmont's project would serve. In evaluating a CON application, DCH is directed to consider, among other things, whether "[e]xisting alternatives for providing

---

[17] Evidence showed that Northstar Cherokee, the only radiation therapy provider in Cherokee County, was operating at over 100 percent utilization in 2015.

services in the service area the same as the new institutional health service proposed are neither currently available, implemented, similarly utilized, nor capable of providing a less costly alternative[.]" OCGA § 31-6-42 (a) (3). See also Ga. Comp. R. & Regs. r. 111-2-2-.09 (1) (c) (3) (In evaluating existing alternatives, "[u]tilization of existing facilities and services similar to a proposal to initiate services shall be evaluated to assure that unnecessary duplication of services is avoided.").

Wellstar contends that DCH "erroneously concludes that Wellstar Kennestone is not an existing alternative because it is not part of the Piedmont system." Neither DCH's final order, nor the hearing officer's findings of fact and conclusions of law incorporated therein, make such a finding. Rather, the hearing officer concluded, even if Wellstar Kennestone had more capacity, "it would not solve the disruption to continuity of care identified by Piedmont." Wellstar does not show that the hearing officer's findings as to the importance of continuity of care in promoting better outcomes, and the negative impact on patients of the lack continuity of care, are unsupported by substantial evidence. As the superior court noted, "if these barriers [as to the lack of continuity of care generally, including lack of access to medical records and treatment information for this subset of patients] didn't exist, different findings may have resulted." Wellstar's argument is without merit.

15

3. Wellstar also claims that, notwithstanding that Kennestone Wellstar radiation therapy services were operating at over 80 percent capacity, it was not, as the hearing officer found, "full for health planning purposes." Wellstar contends that this finding constitutes an erroneous legal conclusion inasmuch as the exceptions to the need standard "allow expansion of an existing service, if the actual utilization of each radiation therapy unit within that service has exceeded 90% of optimal utilization over the most recent two years." Ga. Comp. R. & Regs. r. 111-2-2-.42 (3) (b) 2. DCH was not, however, evaluating Piedmont's CON application based on this exception, and Wellstar does not show that the 90 percent utilization standard is the controlling standard for purposes of considering existing alternatives to a proposed service. Rather, the finding objected to by Wellstar was a finding of fact, and Wellstar makes no attempt to show the finding was not supported by substantial evidence. At the hearing, for example, Piedmont's expert on health planning testified that Wellstar Kennestone was "full for planning purposes."

4. Wellstar argues that DCH's final order erroneously construed the existing alternative criterion for purposes of OCGA § 31-6-42 (a) (3) and failed to apply the atypical barrier exception consistent with its own precedent. Although set forth as a separate claim of error, Wellstar does not offer any independent argument in support

16

of this claim. Rather, Wellstar references arguments that it previously made and which we have already considered. Accordingly, Wellstar shows no error.

5. Wellstar contends that DCH's final order violates its due process and equal protection rights under the Georgia and United States Constitutions by treating it differently from other existing providers. See OCGA § 31-6-44.1 (a) (1) ("[T]he court may reverse or modify the final decision only if substantial rights of the appellant have been prejudiced because . . . the administrative findings, inferences, and conclusions contained in the final decision are . . . [i]n violation of constitutional or statutory provisions[.]"). Wellstar argues that it was treated differently from the similarly situated health care providers who objected to the issuance of a CON in *Emory Johns Creek*. See, e. g., *Hughes v. Reynolds*, 223 Ga. 727, 730 (157 SE2d 746) (1967) ("Where laws are applied differently to different persons under the same or similar circumstances, equal protection of law is denied."). In light of the material dissimilarities between this case and *Emory Johns Creek*, Wellstar does not show that it is in the same or similar circumstances as the objecting providers in that decision. It follows that this claim of error is without merit. See *Charter Medical-Fayette County v. Health Planning Agency*, 181 Ga. App. at 185 (4) (dissimilarities in

17

circumstances in issuance of a CON rendered appellant's equal protection argument meritless).

In light of all of the foregoing, we conclude that the superior court did not err in affirming DCH's final order.

*Judgment affirmed. Bethel, J., and Senior Appellate Judge Herbert E. Phipps concur.*